FILED
2013 Jul-09  AM 10:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHWESTERN DIVISION

| | |
|---|---|
| JUANICA BAUGH, | ) |
| | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )     Civil Action No. CV-12-S-2000-NW |
| | ) |
| MUSCLE SHOALS BOARD OF | ) |
| EDUCATION and JEFF | ) |
| WOOTEN, | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Juanica Baugh, alleges that defendants, the Muscle Shoals Board of Education and its superintendent, Jeff Wooten, discriminated against her on the basis of her race by electing not to renew her employment contract for the position of science teacher at Muscle Shoals High School.[1]  Plaintiff asserts claims for discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981.[2]  This action is before the court on defendants' motion for summary judgment.[3]  Upon consideration, this court will grant the motion.

## I.  SUMMARY JUDGMENT STANDARDS

---

[1] *See* doc. no. 1 (Complaint).  Plaintiff initiated this action *pro se* on May 29, 2012.  *See id.* Counsel appeared on plaintiff's behalf on August 3 of that year.  *See* doc. no. 7 (Notice of Appearance).  Even so, counsel has not assisted plaintiff in filing an amended complaint.

[2] Doc. no. 1 (Complaint) ¶¶ 1.

[3] *See* doc. no. 12 (Motion for Summary Judgment).

Federal Rule of Civil Procedure 56 indicates that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he plain language of [that rule] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (alterations supplied).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> [However,] [t]he mere existence of *some* factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable [factfinder] to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (internal citations omitted) (alterations and emphasis suppled).

## II.  SUMMARY OF FACTS

### A.    Plaintiff's Hiring

Plaintiff is an African-American female who was employed as a non-tenured

science teacher by the Muscle Shoals Board of Education ("the Board") at Muscle Shoals High School for two years.[4]  Prior to her employment by the Muscle Shoals Board, plaintiff had served as a science teacher with two other school systems:  *i.e.*, the Anniston City Board of Education from 1999 to 2003; and the Talladega Board of Education from 2004 to 2008.[5]  Plaintiff voluntarily left her employment with the Anniston City Board because she changed her residence, and voluntarily left her employment with the Talladega Board to obtain a master's degree.[6]

The Muscle Shoals Board of Education posted an opening for a science teacher at Muscle Shoals High School at some point in early 2009.[7]  Muscle Shoals High School Principal H.L. Noah and Assistant Principals Jason Simmons and Denise Woods interviewed several applicants (of whom plaintiff was the only African-American), and unanimously agreed that plaintiff was the superior candidate.[8]  Accordingly, Noah recommended plaintiff's hiring to the Superintendent of the Muscle Shoals School System, Jeff Wooten, on June 25, 2009.[9]  In turn, Dr. Wooten

---

[4] Doc. no. 1 (Complaint), Exhibit A (02/28/12 EEOC Charge); doc. no. 13-11 (Affidavit of Denise Woods) ¶ 5; doc. no. 13-13 (Affidavit of Jason Simmons) ¶ 5; doc. no. 13-15 (Affidavit of H.L. Noah) ¶¶ 2, 5, 25; *id.*, Exhibit C (05/24/11 Notice of Non-Renewal).

[5] Doc. no. 13-1 (Deposition of Plaintiff), at 22-25.

[6] *Id.* at 23-26.

[7] Doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 4.

[8] Doc. no. 13-11 (Affidavit of Denise Woods) ¶ 5; doc. no. 13-13 (Affidavit of Jason Simmons) ¶ 5; doc. no. 13-15 (Affidavit of H.L. Noah) ¶¶ 2, 5.

[9] Doc. no. 13-11 (Affidavit of Denise Woods) ¶ 5; doc. no. 13-13 (Affidavit of Jason Simmons) ¶ 5; doc. no. 13-15 (Affidavit of H.L. Noah) ¶¶ 2, 5.

recommended her hiring to the School Board, which approved the recommendation.[10]

## B.   Plaintiff's Impression of the Racial "Climate" at Muscle Shoals High School

Plaintiff served as a science teacher at Muscle Shoals High School during the 2009-10 and 2010-11 school years.[11]  She was one of three African-American teachers in the school, but the only one to teach a required subject.[12]  Plaintiff formed an unfavorable opinion of the racial climate at Muscle Shoals High School.  The following jumbled, bordering upon incomprehensible, testimony constitutes her attempt to explain some of the reasons for her negative attitude:

> Any time you walked in a faculty room — mind you, you could count the blacks at the school anyway.  ["]Hi, Bob.  How are you doing?["]  ["]Everything is great.["]  ["]Good.["]  I may walk by [Principal H.L. Noah] and he not say anything.  I personally will still speak to him.  I had talked to [School Board Member Willis] Thompson[13] when he would sometimes — the [B]oard members would come to our school.  And I told him before about the climate and how it feels.  I said[, "T]hey go to church together, they are twenty year friends.  They're reporting stuff to you because they're friends.  He's not my principal.  He's their friend.["]  Mr. Thompson would give me advice.  ["]Just don't let it bother you, just keep on going.["]

> [Principal H.L. Noah] would correct me.  He told me one time,

---

[10] Doc. no. 13-11 (Affidavit of Denise Woods) ¶ 5; doc. no. 13-13 (Affidavit of Jason Simmons) ¶ 5; doc. no. 13-15 (Affidavit of H.L. Noah) ¶¶ 2, 5.

[11] Doc. no. 13-1 (Deposition of Plaintiff), at 40-42; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 8.

[12] Doc. no. 1 (Complaint) ¶ 4; doc. no. 13-1 (Deposition of Plaintiff), at 153-54.

[13] Willis Thompson, like plaintiff, is African-American.  Doc. no. 13-7 (Deposition of Pam Doyle), at 7.

["]Hey, we're going to do something for the black kids or the minority kids. They want a step team. They didn't grow up learning how to play these instruments.["]  He said[, "G]reat.["]  I made an announcement, ["]Anybody want to do the step team?["]  After [the] black history [program], they were excited. They wanted to do something. They don't have any other voice there. Made an announcement over the intercom, ["C]ome sign up.["]  I'm walking to my class, which is how he corrects me. He doesn't call me in . . . . "Ms. Baugh, I didn't give you approval to go ahead and say we were really going to do that." ["]Good morning. What are you talking about?["]  He has never talked to anybody else at that school like that. Not where I've seen openly.[14]

## C.   Plaintiff's Job Performance

During the course of plaintiff's two years at Muscle Shoals High School, all of plaintiff's student's advanced to the following grade level.[15]  Further, plaintiff sang at school programs, served as the faculty sponsor for an African-American history program, and assisted other teachers with a recycling program, a pep rally, and a music event.[16]  Even so, Principal H.L. Noah testified that he personally witnessed problems with plaintiff's job performance, and received additional complaints about plaintiff from her co-workers and the parents of her students.[17]  Some of those "problems" and parent complaints are discussed in the following subsections.

### 1.   Tardiness

---

[14] Doc. no. 13-1 (Deposition of Plaintiff), at 118-19 (alterations, footnote, and paragraph break supplied).

[15] Doc. no. 15-2 (Declaration of Plaintiff).  The declaration is a single-page, handwritten document containing one paragraph.  *See id.*

[16] Doc. no. 13-1 (Deposition of Plaintiff), at 141.

[17] Doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 9.

Within the first few months of plaintiff's employment, Principal H.L. Noah received several reports from Assistant Principal Jason Simmons and Science Department Chair Kathy Eldridge that plaintiff was late for school.[18]  At some point before October of 2009, Noah counseled plaintiff regarding her tardiness.[19]  During her meeting with Noah, plaintiff admitted that she had been arriving late, and attributed the problem to the fact that she was in the process of changing her residence.[20]  After that conversation, plaintiff allegedly began to arrive on time.[21]

### 2.    Failure to attend mandatory faculty meetings

Principal H.L. Noah regularly held mandatory faculty meetings in order to report information received from Superintendent Jeff Wooten, and for the purpose of discussing upcoming events, testing information, school policies, and safety and emergency procedures.[22]  Teachers received notifications and reminders of the meetings by several means, including electronic mail ("e-mail").[23]  Noah and other school employees noticed that plaintiff missed a number of the faculty meetings

---

[18] Doc. no. 13-10 (Affidavit of Kathryn Eldridge) ¶ 6; doc. no. 13-13 (Affidavit of Jason Simmons) ¶ 10; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 18.

[19] Doc. no. 13-1 (Deposition of Plaintiff), at 50-52.

[20] *Id.*

[21] *Id.* at 52.

[22] *Id.* at 55-57; doc. no. 13-10 (Affidavit of Kathryn Eldridge) ¶ 13; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 10.

[23] Doc. no. 13-10 (Affidavit of Kathryn Eldridge) ¶ 13; doc. no. 13-13 (Affidavit of Jason Simmons) ¶ 11.

without explanation.[24]  At one such meeting, Noah observed plaintiff's absence, and questioned Science Department Chair Kathy Eldridge regarding plaintiff's failure to attend.[25]  Eldridge told Noah that she had seen plaintiff in her classroom when she (Eldridge) left to attend the meeting.[26]  On another occasion, Assistant Principal Jason Simmons had to find plaintiff and direct her to come to the meeting.[27]

Noah counseled plaintiff regarding her pattern of missing faculty meetings at some point during the 2009-10 school year.[28]  Even so, plaintiff acknowledged that she missed a number of faculty meeting during the 2009-10 *and 2010-11* school years.[29]  Plaintiff alleged that, initially, she was not aware that the meetings were mandatory; but, even after learning of that fact, she still had occasional scheduling conflicts.[30]  She also pointed the finger at others, saying that football, basketball, and tennis coaches missed faculty meetings, but were not reprimanded.[31]

---

[24] Doc. no. 13-10 (Affidavit of Kathryn Eldridge) ¶ 14; doc. no. 13-11 (Affidavit of Denise Woods) ¶ 13; doc. no. 13-12 (Affidavit of Sonya Allman) ¶ 6; doc. no. 13-13 (Affidavit of Jason Simmons) ¶ 12; doc. no. 13-14 (Affidavit of Judy Noah) ¶ 7; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 11.

[25] Doc. no. 13-10 (Affidavit of Kathryn Eldridge) ¶ 14.

[26] *Id.*

[27] Doc. no. 13-13 (Affidavit of Jason Simmons) ¶ 12; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 11.

[28] Doc. no. 13-1 (Deposition of Plaintiff), at 55-60; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 12.

[29] Doc. no. 13-1 (Deposition of Plaintiff), at 55-60.

[30] *Id.*

[31] *Id.* at 121-23.

### 3.     Failure to provide substitute teachers with proper lesson plans and additional required information

When Muscle Shoals High School teachers were absent from school, they were required to provide substitute teachers with lesson plans that keep their students busy for the duration of the class period.[32]   They were also required to leave substitute teachers a seating chart, a description of school emergency procedures, and notes about students' medical needs.[33]   Science Department Chair Kathy Eldridge and science teacher Leella Holt received several reports from various substitute teachers that plaintiff had failed to provide them with proper lesson plans.[34]   On those occasions, Eldridge and Holt went to plaintiff's classroom, and found either that plaintiff had left no lesson plans at all, or that she had left plans that did not keep her students occupied for the duration of the class period.[35]   Eldridge also was not able to locate seating charts, descriptions of school emergency procedures, and notes about students' medical needs.[36]   As a result, Eldridge and Holt used their class time to write

---

[32] Doc. no. 13-10 (Affidavit of Kathryn Eldridge) ¶ 7; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 16; doc. no. 13-16 (Affidavit of Leella Holt) ¶ 5.

[33] Doc. no. 13-10 (Affidavit of Kathryn Eldridge) ¶ 7; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 16; doc. no. 13-16 (Affidavit of Leella Holt) ¶ 5.

[34] Doc. no. 13-10 (Affidavit of Kathryn Eldridge) ¶ 8; doc. no. 13-16 (Affidavit of Leella Holt) ¶ 6.

[35] Doc. no. 13-10 (Affidavit of Kathryn Eldridge) ¶ 8; doc. no. 13-16 (Affidavit of Leella Holt) ¶ 6.

[36] Doc. no. 13-10 (Affidavit of Kathryn Eldridge) ¶ 8.

lesson plans for plaintiff's substitute teachers.[37]  Eldridge repeatedly complained to Principal H.L. Noah regarding plaintiff's omissions.[38]

Plaintiff denied that she failed to provide substitute teachers with proper lesson plans and additional required information.[39]  Even so, she admitted that, on one occasion, a substitute teacher could not locate her lesson plans, that another teacher reported the incident to Principal H.L. Noah, and that Noah brought the incident to plaintiff's attention.[40]

### 4. Failure to follow standard laboratory safety measures

Muscle Shoals High School science teachers were required to ensure that students wear goggles and aprons while handling acidic chemicals.[41]  Science teachers were also required to prevent their students from handling open containers of chemicals outside the laboratory, especially if those containers were made of glass.[42] Science Department Chair Kathy Eldridge and science teacher Leella Holt allegedly

---

[37] *Id.*; doc. no. 13-16 (Affidavit of Leella Holt) ¶ 6.

[38] Doc. no. 13-10 (Affidavit of Kathryn Eldridge) ¶ 8; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 16; doc. no. 13-16 (Affidavit of Leella Holt) ¶ 6.

[39] Doc. no. 13-1 (Deposition of Plaintiff), at 60-64.

[40] *Id.*

[41] Doc. no. 13-10 (Affidavit of Kathryn Eldridge) ¶ 9; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 7.

[42] Doc. no. 13-10 (Affidavit of Kathryn Eldridge) ¶ 9; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 7.

witnessed a number of safety violations by plaintiff's students.[43]

On one occasion, Holt noticed that plaintiff's students were handling acids without wearing goggles.[44]   Holt reported the incident to an unidentified school administrator.[45]   On multiple other occasions, Eldridge observed that plaintiff's students were handling acids without wearing goggles or aprons.[46]  Eldridge also saw one of plaintiff's students dump the contents of an open, glass container onto the grass.[47]  Eldridge reported the incidents to Principal H.L. Noah.[48]

Plaintiff denied that she allowed her students to handle chemicals without wearing goggles and aprons, but admitted that she allowed them to dump a container of water and food coloring onto the grass.[49]  She also denied being counseled about laboratory safety by Principal H.L. Noah or Assistant Principals Jason Simmons and Denise Woods.[50]

### 5.   Failure to attend graduation examination training sessions

The State Department of Education required the Board to train its teachers

---

[43] Doc. no. 13-10 (Affidavit of Kathryn Eldridge) ¶¶ 10-12; Doc. no. 13-16 (Affidavit of Leella Holt) ¶ 8.

[44] Doc. no. 13-16 (Affidavit of Leella Holt) ¶ 8.

[45] *Id.*

[46] Doc. no. 13-10 (Affidavit of Kathryn Eldridge) ¶¶ 10-12.

[47] *Id.*

[48] *Id.*

[49] Doc. no. 13-1 (Deposition of Plaintiff), at 68-69.

[50] *Id.* at 66-69.

before they administer the high school graduation examination.[51]   Building Test Coordinator Judy Noah, the wife of Principal H.L. Noah, noticed that plaintiff repeatedly failed to attend the scheduled training sessions.[52]   Ms. Noah had to locate plaintiff on the morning of the examination in order to ensure that she knew how the test was supposed to be administered.[53]   Ms. Noah reported plaintiff's failure to attend the training to her husband, Principal H.L. Noah.[54]   Plaintiff admitted that she missed the training, but could not recall her reasons for doing so.[55]

In response to defendant's motion for summary judgment, plaintiff asserts that she "was never counseled for missed graduation exam training."[56]   To support that statement, plaintiff cites her deposition at "Defendant's ex 1, Tab A, page 75, lines 20-23."[57]   Upon review, the claim that plaintiff "was never counseled" for missing the training is inconsistent with the cited testimony, which reads as follows:

> Q.   Were you ever counseled by Mr. Noah or Ms. Woods or Mr. Simmons about missing the Alabama Graduation Exam training?
>
> A.   I seem to remember either Ms. Woods or one of the counselors saying something in regards to why I missed that particular

---

[51] Doc. no. 13-14 (Affidavit of Judy Noah) ¶ 9.

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] Doc. no. 13-1 (Deposition of Plaintiff), at 74-75.

[56] Doc. no. 15 (Response to Motion for Summary Judgment), at 7.

[57] *Id.*

11

meeting.[58]

### 6.    Failure to attend scheduled parent-teacher conferences

The parents of several of plaintiff's students complained to Principal H.L. Noah, his wife, Judy Noah, and Assistant Principals Denise Woods and Jason Simmons that plaintiff had failed to attend scheduled parent-teacher conferences.[59] In turn, Simmons reported the complaints he received to Principal H.L. Noah.[60] Plaintiff denied missing any appointments with parents.[61]

### 7.    Failure to communicate with parents

Principal H.L. Noah emphasized the importance of communication between teachers and parents, and required all teachers to call the parents of students whose grades dropped during the year.[62]   The parents of several of plaintiff's students complained to Noah that plaintiff did not communicate with them when their children's grades fell.[63]   Parents also complained to Principal H.L. Noah's wife, Judy Noah, Assistant Principal Jason Simmons, Guidance Counselor Sonya Allman, and

---

[58] Doc. no. 13-1 (Deposition of Plaintiff), at 75.

[59] Doc. no. 13-11 (Affidavit of Denise Woods) ¶ 11; doc. no. 13-13 (Affidavit of Jason Simmons) ¶ 13; doc. no. 13-14 (Affidavit of Judy Noah) ¶ 8; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 15.

[60] Doc. no. 13-13 (Affidavit of Jason Simmons) ¶ 13; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 15.

[61] Doc. no. 13-1 (Deposition of Plaintiff), at 72.

[62] Doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 15.

[63] *Id.*

Science Department Chair Kathy Eldridge that plaintiff did not return their telephone calls or respond to e-mails.[64]  In turn, Simmons, Allman, and Eldridge reported the complaints to Principal H.L. Noah.[65]

Plaintiff denied awareness of parent complaints regarding her failure to communicate.[66]  Inconsistently with that denial, plaintiff recalled that Principal H.L. Noah spoke to her about failing to respond to a parent's e-mail.[67]

### 8.    Failure to submit grades in a timely manner

To avoid delays in the issuance of report cards and class schedules, it was important for Muscle Shoals High School teachers to furnish the administration with student grades in a timely manner.[68]  Guidance Counselor Sonya Allman informed Principal H.L. Noah that plaintiff repeatedly failed to provide student grades by the deadline.[69]  Plaintiff did not recall providing student grades late.[70]

### 9.    Leaving school early

---

[64] Doc. no. 13-10 (Affidavit of Kathryn Eldridge) ¶ 15; doc. no. 13-12 (Affidavit of Sonya Allman) ¶ 7; doc. no. 13-13 (Affidavit of Jason Simmons) ¶ 13; doc. no. 13-14 (Affidavit of Judy Noah) ¶ 8.

[65] Doc. no. 13-10 (Affidavit of Kathryn Eldridge) ¶ 15; doc. no. 13-12 (Affidavit of Sonya Allman) ¶ 7; doc. no. 13-13 (Affidavit of Jason Simmons) ¶ 13; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 15.

[66] Doc. no. 13-1 (Deposition of Plaintiff), at 72-73.

[67] Id.

[68] Doc. no. 13-12 (Affidavit of Sonya Allman) ¶ 8; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 17.

[69] Id.

[70] Doc. no. 13-1 (Deposition of Plaintiff), at 77-80.

13

Science Department Chair Kathy Eldridge informed Principal H.L. Noah that she often saw plaintiff leave early on those days when her planning period occurred at the end of the day.[71]  Plaintiff denied leaving early without permission.[72]

## D.     Science Teacher Leah Torisky's Job Performance

Plaintiff's complaint asserts that "a similarly-situated, non-tenured, White science teacher with less experience than [plaintiff] retained her position as a science teacher at Muscle Shoals High School."[73]   The teacher referenced in plaintiff's complaint is Leah Torisky, who also was employed as a non-tenured science teacher during the 2009-10 and 2010-11 school years, and who attained tenure the following year.[74]

In addition to teaching science classes, Leah Torisky assisted with Muscle Shoals High School's cheerleading program.[75]  Plaintiff overheard a conversation among Leah Torisky, Leella Holt, and other science teachers, during which Torsiky allegedly told her co-workers that the parents of some of the cheerleaders had complained about her handling of two incidents, and that she (Torisky) had been

---

[71] Doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 19.

[72] Doc. no. 13-1 (Deposition of Plaintiff), at 90.

[73] Doc. no. 1 (Complaint) ¶ 12 (alteration supplied).

[74] Doc. no. 13-1 (Deposition of Plaintiff), at 142-43, 149-50; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 30.

[75] Doc. no. 13-1 (Deposition of Plaintiff), at 143.

"called to the office."[76]

Plaintiff's testimony about the alleged incidents is not comprehensible.  One incident concerned the pregnancy of one of the cheerleaders on Leah Torisky's team.[77] Plaintiff testified as follows:

> Q.   First, let's start with the pregnant [sic].  Was it a cheerleader who was pregnant?
>
> A.   Yes.
>
> Q.   What did Ms. T[o]reski do?
>
> A.   What I heard her talk about was the fact the girl was lying and it was an issue with Ms. T[o]reski because of the health and safety and the parents.  So, this is not public knowledge.  They would know.  I only can repeat.
>
> Q.   I'm only asking you what you heard.  You can't tell me what you don't know.
>
> A.   That's it.
>
> Q.   What did Ms. T[o]reski do wrong in that situation?
>
> MR. BENNITT: Objection to form.
>
> A.   All I know —
>
> Q.   Allegedly?

---

[76] *Id.* at 143-46.

[77] *Id.* at 145.

A.     All I know is parents complained.  She was called to the office.[78]

Plaintiff also claimed that several cheerleaders under Leah Torisky's supervision posted "provocative, slang, curse kind of stuff" on Facebook, and that Torisky "made those girls sit out."[79]  When questioned about the incident, plaintiff was not able to explain whether the parents who allegedly lodged complaints against Torisky were upset about the inappropriate Facebook posts, or about Torisky's response to the posts.[80]  She also did not state whether Torisky was reprimanded.[81]

Principal H.L. Noah and Superintendent Jeff Wooten testified that they never received complaints about Leah Torisky's performance *as a teacher*.[82]  Further, Noah, Assistant Principals Jason Simmons and Denise Woods, Guidance Counselor Sonya Allman, and Science Department Chair Kathy Eldridge testified that they believed Torinsky was an excellent *teacher*, and that her job performance was far superior to that of plaintiff.[83]

## E.     Principal H.L. Noah's Communications with Superintendent Jeff Wooten Regarding Plaintiff

---

[78] *Id.* at 145-46 (alterations supplied).

[79] *Id.* at 144-45.

[80] *Id.* at 146.

[81] *See* doc. no. 13-1 (Deposition of Plaintiff), at 146.

[82] Doc. no. 13-9 (Affidavit of Jeff Wooten) ¶ 14; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 30.

[83] Doc. no. 13-10 (Affidavit of Kathryn Eldridge) ¶ 18; doc. no. 13-11 (Affidavit of Denise Woods) ¶ 21; doc. no. 13-12 (Affidavit of Sonya Allman) ¶ 9; doc. no. 13-13 (Affidavit of Jason Simmons) ¶ 21; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 30.

Superintendent Jeff Wooten did not have the opportunity to observe the daily job performance of teachers in the Muscle Shoals School System.[84]  Accordingly, he frequently inquired about the performance of new teachers at monthly meetings with the principals of schools within the system.[85]  Dr. Wooten believed that "[i]t [was] important that poor performing teachers [be] terminated before they attain tenure [because a]fter teachers attain tenure, it is more difficult and expensive to terminate their employment."[86]

When Superintendent Jeff Wooten met with Principal H.L. Noah, they discussed the new teachers at Muscle Shoals High School.[87]  During the 2009-10 and 2010-11 school years, Noah frequently expressed serious concerns about plaintiff's job performance, including her pattern of arriving late and leaving early, and her failure to attend faculty meetings, to provide substitute teachers with proper lesson plans and additional required information, to follow standard laboratory safety measures, to attend graduation examination training sessions, to attend scheduled parent-teacher conferences, to communicate with parents, and to submit grades in a

---

[84] *See* Doc. no. 13-1 (Deposition of Plaintiff), at 99-101; doc. no. 13-9 (Affidavit of Jeff Wooten) ¶ 8.

[85] Doc. no. 13-9 (Affidavit of Jeff Wooten) ¶ 6.

[86] *Id.* ¶ 4 (alterations supplied).

[87] *Id.* ¶ 7; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 20).

timely manner.[88]

## F.   Principal H.L. Noah's Recommendation Not to Renew Plaintiff's Employment Contract

Since the 2010-11 school year was plaintiff's second year of employment with the Board, she did not attain tenured status by May of 2011.  Thus, the Board could terminate her employment without cause by simply failing to renew her contract.[89] To do so, the Superintendent had to recommend the non-renewal of her contract, and a majority of the five members of the School Board had to vote in favor of non-renewal.[90]

Principal H.L. Noah gave Superintendent Jeff Wooten a written memorandum recommending the non-renewal of plaintiff's employment contract on May 16, 2011.[91] While the memorandum includes only plaintiff's name, and does not identify the reasons for the recommendation, Noah testified that he made the recommendation based upon the issues previously discussed — all of which he had verbally communicated to Dr. Wooten during the meetings discussed in Part II(E), *supra*.[92]

Superintendent Jeff Wooten and Principal H.L. Noah deny that Dr. Wooten

---

[88] Doc. no. 13-9 (Affidavit of Jeff Wooten) ¶ 7; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 20.

[89] *See* Alabama Code § 16-24-1, *et seq*.

[90] *See* Alabama Code §§ 16-12-16, 16-24-12.

[91] Doc. no. 13-9 (Affidavit of Jeff Wooten) ¶ 9; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 22; *id.*, Exhibit B (05/16/11 Memo from H.L. Noah to Jeff Wooten).

[92] Doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 22.

"told," "directed," or "suggested" to Noah that he should recommend the non-renewal of plaintiff's employment contract.[93]  Rather, Dr. Wooten alleged that, because Noah was the principal of Muscle Shoals High School and interacted with its teachers on a daily basis, he deferred to Noah's personnel recommendations.[94]

## G.   Non-Renewal of Plaintiff's Employment Contract

Based on Principal H.L. Noah's description of plaintiff's performance problems, and his recommendation not to renew her employment contract, Superintendent Jeff Wooten exercised his authority and discretion to recommend the non-renewal of her employment contract to the Board.[95]  The Board approved the Superintendent's recommendation by a 4-1 vote during a meeting held on May 23, 2011.[96]  Board Members Mike Elliott, Pam Doyle, Don Pendergrass, and Farrell Southern voted in favor of the recommendation, and Board Member Willis Thompson voted against the recommendation.[97]  Thompson, like plaintiff, is African-American.[98]

### 1.   Knowledge of Plaintiff

---

[93] Doc. no. 13-9 (Affidavit of Jeff Wooten) ¶ 8; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 20.

[94] Doc. no. 13-9 (Affidavit of Jeff Wooten) ¶ 8.

[95] Doc. no. 13-9 (Affidavit of Jeff Wooten) ¶ 9.

[96] *Id.* ¶ 10; *see also id.*, Exhibit B (Minutes of 05/23/11 Board Meeting).

[97] Doc. no. 13-9 (Affidavit of Jeff Wooten) ¶ 10; *see also id.*, Exhibit B (Minutes of 05/23/11 Board Meeting).

[98] Doc. no. 13-7 (Deposition of Pam Doyle), at 7.

Of the Board members who voted not to renew plaintiff's employment contract, three (Mike Elliott, Pam Doyle, and Farrell Southern) did not know plaintiff; and two of those three (Elliot and Doyle) did not know her race.[99]   Southern "assumed" that plaintiff was African-American as a result of an event that occurred during the meeting, an event that is discussed in the following section.[100]   Don Pendergrass did not remember anything to do with the meeting.[101]   Due to Pendergrass's lapse in memory, his deposition testimony is less than one page in length, contains no evidence relevant to the present motion, and will not be discussed.

Board Member Willis Thompson and plaintiff have offered conflicting accounts about how well Thompson knew plaintiff before he cast the sole vote in favor of renewing her employment contract.   Thompson alleged that he "*knew of*" plaintiff, was aware of her race, had seen her during a pre-homecoming dance, and heard her sing at a school basketball game.[102]   As discussed in Section II(B), *supra*, however, plaintiff also stated that she complained to Thompson about the racial "climate" at Muscle Shoals High School, and that Thompson "would give [her] advice [such as,

---

[99] Doc. no. 13-5 (Deposition of Farrell Southern), at 9-10; doc. no. 13-6 (Deposition of Mike Elliott), at 6-8; doc. no. 13-7 (Deposition of Pam Doyle), at 6.

[100] *See* doc. no. 13-5 (Deposition of Farrell Southern), at 12.

[101] Doc. no. 13-8 (Deposition of Don Pendergrass), at 5.

[102] Doc. no. 13-4 (Deposition of Willis Thompson), at 8, 15, 20.

"]Just don't let it bother you, just keep on going.["][103]

## 2.    Manner of Voting

Superintendent Jeff Wooten originally presented his recommendation not to renew plaintiff's employment contract as part of a two-page, ten-item personnel report that concerned:  (*i*) nine resignations; (*ii*) one resignation and assignment; (*iii*) one employment; (*iv*) eight re-employments of first-year teachers; (*v*) three re-employments of second-year teachers; (*vi*) nine continuing service statuses for teachers; (*vii*) one continuing service status for an administrator; (*viii*) one transfer; (*ix*) one termination; and (*x*) one non-renewal (*i.e.*, plaintiff's employment contract).[104] The report did not identify the reasons for any of Dr. Wooten's recommendations.[105]

The minutes of the Board meeting state that, after the Superintendent recommended the approval of the personnel report, "[a] request to pull personnel Items I-7 [which concerned the resignation of Special Education Aide Bridgette Phillips[106]] and X-1 [which concerned the non-renewal of plaintiff's employment contract] for separate vote was made by Mr. Thompson."[107]  Thompson did not state

---

[103] Doc. no. 13-1 (Deposition of Plaintiff), at 118-19 (alterations supplied).

[104] Doc. no. 13-9, Exhibit B (Minutes of 05/23/11 Board Meeting), at 15, 18-19.

[105] *See id.*

[106] The record contains no further information regarding Bridgette Phillips, such as her race, the circumstances of her resignation, or the reasons for Willis Thompson's request to separate her vote from other personnel matters.

[107] Doc. no. 13-9, Exhibit B (Minutes of 05/23/11 Board Meeting), at 15 (alterations supplied).

21

his reasons for requesting a separate vote regarding those issues, and the other Board members did not seek an explanation for his request.[108]  As a result of that request, Farrell Southern "assumed" that plaintiff was African-American.[109]  Following the separation of the personnel matters,

> Superintendent Wooten changed his recommendation to recommend approval of the Personnel Report excluding·Items I-7 and X-1.  A motion to approve the superintendent's recommendation was made by Mr. Thompson and seconded by Mr. Pendergrass.  No discussion followed and the superintendent's recommendation was subsequently approved by five yes votes.
>
> Superintendent Wooten recommended approval of the Personnel Report Items I-7 and X-1.  A motion to approve the superintendent's recommendation was made by Mr. Southern and seconded by Mrs. Doyle.  *No discussion followed* and the superintendent's recommendation was subsequently approved by four yes votes and one no vote.  *Mr. Thompson cast the no vote stating his opposition to the specific personnel items was due to lack of information provided on these items.*[110]

### 3.    Basis for Decision

The Board did not receive evidence or conduct an independent inquiry into plaintiff's performance.[111]  Rather, the majority of the Board members voted not to

---

[108] Doc. no. 13-4 (Deposition of Willis Thompson), at 39; doc. no. 13-5 (Deposition of Farrell Southern), at 12; doc. no. 13-6 (Deposition of Mike Elliott), at 8; doc. no. 13-7 (Deposition of Pam Doyle), at 7.

[109] Doc. no. 13-5 (Deposition of Farrell Southern), at 12.

[110] Doc. no. 13-9, Exhibit B (Minutes of 05/23/11 Board Meeting), at 15 (emphasis and alterations supplied).

[111] Doc. no. 13-17 (Affidavit of Pam Doyle) ¶¶ 5-7; doc. no. 13-18 (Affidavit of Mike Elliott) ¶¶ 5-7; doc. no. 13-19 (Affidavit of Farrell Southern) ¶¶ 5-7.

renew her employment contract based *solely* upon the Superintendent's recommendation.[112]  Mike Elliot explained his decision as follows:

> Q.    Was [plaintiff's] contract non-renewed for incompetency, insubordination, failure to perform duties in a satisfactory manner or decrease in the number of teaching positions or other good cause?  Was that the reason for the non-renewal?  Any of those reasons for the non-renewal?
>
> A.    The superintendent just told us that he had reasons to not renew or to not keep [plaintiff].[113]

Pam Doyle offered similar testimony:

> Q.    . . . . When you made your decision to not renew the contract of [plaintiff], did you take into consideration whether or not she was incompetent, insubordinate, neglected her duty, immoral, failed to perform her duties in a satisfactory manner, just cause, decrease in teaching positions?  Any of those criteria when y'all made the vote?
>
> A.    No.

Farrell Southern testified as follows:

> Q.    Did you know of any performance reasons, poor performance reasons, when you did not renew [plaintiff's] contract?
>
> A.    Again, all we did was act upon the [Superintendent's] recommendation.[114]

---

[112] *See* doc. no. 13-5 (Deposition of Farrell Southern), at 9-10; doc. no. 13-6 (Deposition of Mike Elliott), at 6-8; doc. no. 13-7 (Deposition of Pam Doyle), at 6; doc. no. 13-8 (Deposition of Don Pendergrass), at 5.

[113] Doc. no. 13-6 (Deposition of Mike Elliott), at 6 (alterations supplied).

[114] Doc. no. 13-5 (Deposition of Farrell Southern), at 8-9 (alterations supplied).

Willis Thompson stated that he opposed the Superintendent's recommendation that plaintiff's contract should not be renewed "because [he] did not have enough information to base a vote of non-renewal."[115]  Specifically, he testified that he was "not fully aware of [plaintiff's] shortcomings," and "did not know the situation."[116]

## H.    Notice to Plaintiff

Principal H.L. Noah gave plaintiff written notice of the non-renewal of her employment contract on May 24, 2011.[117]  Plaintiff alleged that the notice came as a surprise because, "as far as [she] knew, [she] was coming back" to teach during the 2011-12 school year.[118]  Plaintiff pointed to the fact that she previously had been approved to attend a training in July of 2011, and that Science Department Chair Kathy Eldridge had stated that "nobody should be cut from our department."[119] During her deposition, plaintiff testified that, when she asked Noah why her contract would not be renewed, he responded that he "was not at liberty to say."[120]  However, both her EEOC charge and her complaint state that the reason for the non-renewal was

---

[115] Doc. no. 13-4 (Deposition of Willis Thompson), at 39 (alteration supplied).

[116] *Id.* at 19 (alteration supplied).

[117] Doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 25; *id.*, Exhibit C (05/24/11 Notice of Non-Renewal).

[118] Doc. no. 13-1 (Deposition of Plaintiff), at 126-27 (alterations supplied).

[119] *Id.* at 129-30.

[120] *Id.* at 92.

"tardiness."[121]

## I.    Statement by School Resource Officer Gerald Smith

Plaintiff testified that, at some point after the non-renewal of her employment contract, School Resource Officer Gerald Smith told her that she "needed to look into" the non-renewal, and that it "was not based on [her] performance."[122]  She also claimed that Smith told her "that [Board Member Willis] Thompson told him in confidence that the reason he did not vote for [the non-renewal] is because no information was given.  It was some vague allegations . . . . [Smith] said that [Thompson] asked for proof and none was given to him."[123]

## J.    Transfer of Mallory Kincaid

After voting not to renew plaintiff's employment contract, the Board posted an opening for a science teacher at Muscle Shoals High School.[124]  At some point within the next few months, Principal H.L. Noah learned that Mallory Kincaid (a science teacher at Muscle Shoals Middle School, and the daughter of Superintendent Jeff Wooten) was interested in teaching at Muscle Shoals High School.[125]

Principal H.L. Noah asked Assistant Principals Jason Simmons and Denise

---

[121] Doc. no. 1 (Complaint) ¶ 17 ; *id.*, Exhibit A (02/28/12 EEOC Charge).

[122] Doc. no. 13-1 (Deposition of Plaintiff), at 106 (alteration supplied).

[123] *Id.* at 108-09 (alterations supplied).

[124] Doc. no. 13-9 (Affidavit of Jeff Wooten) ¶ 13.

[125] *Id.* ¶ 12; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 27.

Woods for their opinions of Kincaid, and both responded that she "would be a very good teacher."[126]  Noah then asked Kincaid whether she wanted to transfer to Muscle Shoals High School, and she answered in the affirmative.[127]  Accordingly, Noah recommended the transfer to Superintendent Jeff Wooten.[128]

Principal H.L. Noah and Superintendent Jeff Wooten deny that Dr. Wooten "discussed" the possibility of Mallory Kincaid's transfer with Noah at any time prior to the issuance of Noah's written recommendation.[129]  They also deny that anyone "asked" Noah to recommend Kincaid's transfer, or that Dr. Wooten otherwise "influenced" Noah's recommendation.[130]  Instead, Noah testified that he desired Kincaid's transfer "because of her excellent reputation as a teacher and because . . . there was an opening for a science teacher due to the non-renewal of [plaintiff]."[131]

In any event, Superintendent Jeff Wooten recommended the transfer to the Board, and the Board unanimously approved his recommendation on June 6, 2011.[132]

---

[126] Doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 27.

[127] *Id.*

[128] Doc. no. 13-9 (Affidavit of Jeff Wooten) ¶ 12; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 28; *id.*, Exhibit D (06/06/11 Memo from H.L. Noah to Jeff Wooten).

[129] Doc. no. 13-9 (Affidavit of Jeff Wooten) ¶ 12; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 29.

[130] Doc. no. 13-9 (Affidavit of Jeff Wooten) ¶ 12; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 29.

[131] Doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 29 (alteration supplied).

[132] Doc. no. 13-9 (Affidavit of Jeff Wooten) ¶ 12; *id.*, Exhibit C (Minutes of 06/06/11 Board Meeting); doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 29.

### K.    Hiring of Christina Crunk

As a result of the opening created by the transfer of Mallory Kincaid, the Board posted a job opening for a teaching position at Muscle Shoals Middle School, but plaintiff did not apply for the position.[133]  Even if plaintiff had applied, Superintendent Jeff Wooten would not have recommended that she be hired to fill the position, because "[she] had been non-renewed from a different position due to poor job performance," and because, "if [Dr. Wooten] had intended for [plaintiff] to remain employed by the Board as a teacher, [he] would not have recommended the non-renewal of her employment contract."[134]  Dr. Wooten instead recommended Christina Crunk for the position, and the Board approved his recommendation.[135] Plaintiff alleged that when Crunk was hired, she "was about to graduate from college," and "had no experience."[136]

### L.    Plaintiff's EEOC Charge

Plaintiff filed a Charge of Discrimination against the "Muscle Shoals City Schools" with the Equal Employment Opportunity Commission ("EEOC") on

---

[133] Doc. no. 13-1 (Deposition of Plaintiff), at 153; doc. no. 13-9 (Affidavit of Jeff Wooten) ¶ 13.

[134] Doc. no. 13-9 (Affidavit of Jeff Wooten) ¶ 13 (alterations supplied).

[135] *Id.*

[136] Doc. no. 13-1 (Deposition of Plaintiff), at 117.

27

November 18, 2011.[137]  She alleged that her employment contract was not renewed "because of [her] race in violation of Title VII of the Civil Rights Act of 1964, as amended."[138]  The EEOC issued a Notice of Right to Sue on February 28, 2012, stating that it was "unable to conclude that the information obtained establishes violations of the statutes."[139]

## M.   Letters of Recommendation

In October of 2012 (*i.e.*, more than a year after the non-renewal of plaintiff's employment contract), plaintiff obtained three generic letters of recommendation addressed "To Whom It May Concern."[140]  Two of the letters were written by Muscle Shoals High School Commerce and Information Technology Teacher Danyelle Hillman and Physical Education Teacher Brenda Mayes.[141]  The third letter was written by School Resource Officer Gerald Smith, who allegedly told plaintiff that she needed to "look into" her non-renewal based on his conversation with Board Member Willis Thompson.[142]

## III.  DISCUSSION

---

[137] Doc. no. 1 (Complaint), Exhibit A (02/28/12 EEOC Charge).

[138] *Id.* (alteration supplied).

[139] *Id.*

[140] Doc. no. 13-2 (Deposition of Plaintiff), Exhibit 9 (Plaintiff's Rule 26 Disclosures), at 47-49.

[141] *Id.* at 47-48.

[142] *Id.* at 49; *see also id.* at 107; Section II(J), *supra.*

Plaintiff alleges that defendants discriminated against her on the basis of her race by electing not to renew her employment contract in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981.[143]

## A.    Section 1981

Section 1981 provides that

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).  The Eleventh Circuit has explained that:

> Where, as here, a plaintiff predicates liability under Title VII on disparate treatment and also claims liability under section[] 1981 . . ., the legal elements of the claims are identical.  *Lincoln* [*v. Board of Regents*], 697 F.2d [928,] 935 n.6. [(11th Cir. 1983), *cert. denied*, 464 U.S. 826 (1983)].    A plaintiff asserting either claim must prove intentional discrimination.  *Id.*  Therefore, [a court] need not discuss [a] plaintiff's Title VII claims separately from his section 1981 . . . claims.

*Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985) (alterations supplied).

## B.    Title VII

Title VII prohibits an employer from discriminating "against any individual

---

[143] Doc. no. 1 (Complaint) ¶¶ 1.

with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).   Plaintiff has offered no direct evidence of discrimination. Consequently, the court will apply the framework for assessing claims that are based on circumstantial evidence.   Under that framework, the employee bears the initial burden of stating a *prima facie* case of intent to discriminate on the basis of a protected characteristic — here, race.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).   If the employee does so, the *prima facie* case gives rise to "a presumption that the employer unlawfully discriminated against him."   *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981).   The employer then bears the burden of producing, but not proving, a legitimate, nondiscriminatory reason for the challenged employment action.  *See McDonnell Douglas*, 411 U.S. at 802.   "If the [employer] carries this burden of production, the presumption raised by the *prima facie* case is rebutted," *Burdine*, 450 U.S. at 255, and "drops from the case."  *Id.* at 255 n.10 (alteration supplied).   Finally, in the third step of the analysis, the employee "has the opportunity to come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment action."  *Combs v.*

30

*Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citations omitted).

## C.   Plaintiff's *Prima Facie* Case

In discharge situations, courts generally require a plaintiff to demonstrate that: (1) she was a member of a class of persons protected by the statute; (2) she was qualified for the position from which she was discharged; (3) she was, nevertheless, discharged; and (4) following her discharge, the defendant either replaced the plaintiff with someone outside her protected class, or retained other employees who were not within the protected class, and who possessed comparable or lesser qualifications. *See*, *e.g.*, *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 n.6 (11th Cir. 1998);[144] *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th

---

[144] The Eleventh Circuit held in *Jones v. Gerwens*, 874 F.2d 1534 (11th Cir. 1989), a case in which an African-American police officer was suspended as discipline for unauthorized use of a police vehicle, but white police officers who allegedly committed similar offenses received lesser discipline, or no discipline at all, that

> in cases involving alleged racial bias in the application of discipline for violation of work rules, the plaintiff, in addition to being a member of a protected class, must show either (a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct.

*Id.* at 1540. That holding was questioned in the case accompanying this footnote: *i.e.*, *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306 (11th Cir. 1998), a case in which an African-American, female, licensed practical nurse was discharged for violations of work rules (*i.e.*, failing to wear a required uniform, and failing to follow a supervisor's instructions), while white employees allegedly were treated more favorably for similar conduct. The Eleventh Circuit wrote:

> Considering the facts in *Jones*, our impression is that words about "did not violate the work rule" are unnecessary to the decision in *Jones* and are dicta; but we

31

Cir. 1984); *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980).

Here, it is undisputed that plaintiff is African-American, that she was qualified for the position of science teacher at Muscle Shoals High School, that her employment contract was not renewed, and that she was replaced by Mallory Kincaid, a white female.[145]   Accordingly, this court holds that plaintiff has established a *prima facie* case of discrimination.

## D.    Defendant's Allegedly Legitimate Reasons

Defendants have identified nine allegedly legitimate, non-discriminatory reasons for their decision not to renew plaintiff's employment contract, all of which have been discussed in Part II of this opinion: *i.e.*, (*i.*) plaintiff's pattern of arriving late; (*ii*) her pattern of leaving early; (*iii*) her failure to attend mandatory faculty

---

will discuss them.  The pertinent words in *Jones* demand not two, but three elements: (1) the plaintiff is a member of a protected class; (2) the plaintiff has engaged — either (a) disputedly or (b) admittedly — in misconduct similar to persons outside the protected class; and (3) that similarly situated, nonminority employees (that is, persons outside the protected class) received more favorable treatment.

We stress that, under the *Jones* formulation, no plaintiff can make out a prima facie case by showing just that she belongs to a protected class and that she did not violate her employer's work rule.  The plaintiff must also point to someone similarly situated (but outside the protected class) who disputed a violation of the rule and who was, in fact, treated better.

*Id.* at 1311 n.6.

[145] *See* doc. no. 14 (Brief in Support of Motion for Summary Judgment), at 17 n.4 ("The Defendants assume for purpose of this Motion only that [plaintiff] can establish a *prima facie* case.") (alteration supplied).

meetings; (*iv*) her failure to provide substitute teachers with proper lesson plans and additional required information; (*v*) her failure to follow standard laboratory safety measures; (*vi*) her failure to attend graduation examination training sessions; (*vii*) her failure to attend scheduled parent-teacher conferences; (*viii*) her failure to communicate with parents; and (*ix*) her failure to submit grades in a timely manner. Plaintiff, nevertheless, disputes whether defendants have carried their burden of production.

The section of plaintiff's response brief entitled "Second Prong:  No Reason Given for her Termination" begins with the following paragraph:

> MARY CASNA, *Plaintiff-Appellant, v.* CITY OF LOVES PARK, et al., *Defendants-Appellees*.  Appeal from the United States District Court for the Northern District of Illinois, Western Division. No. 04 C 50256 — **Philip G. Reinhard**.  argued October, 30 2007 — DECIDED JULY 24, 2009 No. 07-1044, where the adverse impact comes "on the heels" of the protected activity, suspicious timing sends case to fact-finder to decide if it was discriminatory attitude or poor work performance.[146]

This court is mystified by the above passage, because plaintiff neither asserts a claim for retaliation, nor alleges facts to support such a claim.[147]  The failure of plaintiff's counsel to write in complete sentences, as well as his failure to explain the

---

[146] Doc. no. 15 (Response to Motion for Summary Judgment), at 16 (emphasis in original). Here and elsewhere, all grammatical errors are written exactly as they appear in the brief.

[147] *See* doc. no. 1 (Complaint).

relevance of the cited authority to the present litigation, are representative of the quality of his entire response to defendants' motion for summary judgment. The remaining arguments included by counsel under the heading of "*Second* Prong: No Reason Given for [Plaintiff's] Termination"[148] actually concern the *third* prong of the *McDonnell Douglas* burden-shifting framework, and will be addressed in Section III(D), *infra.*

In any event, an employer can "rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. *The defendant need not persuade the court that it was actually motivated by the proffered reasons.*" *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981) (emphasis supplied) (citing *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 25 (1978)). Defendants have done so here. Accordingly, they have carried their burden of production.

## E.     Pretext

As a result, the burden shifts back to plaintiff "to come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the

---

[148] Doc. no. 15 (Response to Motion for Summary Judgment), at 16 (alteration and emphasis supplied).

employer were not the real reasons for the adverse employment action." *Combs*, 106

F.3d at 1528 (citations omitted).  As the Eleventh Circuit admonished in *Chapman v.*

*AI Transport*, 229 F.3d 1012 (11th Cir. 2000):

> A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer.  Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.  *See Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1341 (11th Cir. 2000) (Title VII case) ("It is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated."); *Combs*, 106 F.3d at 1541-43.  We have recognized previously and we reiterate today that:
>
>> federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions.  No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere.  Rather our inquiry is limited to whether the employer gave an honest explanation of its behavior."

*Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991) (quoting *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir.1988) (citations omitted)); *see also Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir.1984) (An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."); *Abel v. Dubberly*, 210 F.3d 1334, 1339 n. 5 (11th Cir.2000).  We "do not … second-guess the business judgment of employers."  *Combs*, 106 F.3d at 1543; *accord Alexander*, 207 F.3d at 1339, 1341; *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir.1999) ("We have repeatedly and emphatically held

> that a defendant may terminate an employee for a good or bad reason
> without violating federal law.  We are not in the business of adjudging
> whether employment decisions are prudent or fair." (internal citation
> omitted)).

*Chapman*, 229 F.3d at 1030 (footnote omitted).  "With respect to the issue of job

performance, *the question is whether* [*the decision-maker*] *had a good faith belief that*

*plaintiff's job performance was subpar*."  *Alexander v. Baldwin County Board of*

*Education*, No. 07-0333-CB-C, 2008 WL 3551194, * 17 (S.D. Ala. Aug. 12, 2008)

(emphasis and alteration supplied) (citing *Equal Employment Opportunity*

*Commission v. Total System Services, Inc.*, 221 F.3d 1171, 1176-77 (11th Cir. 2000)).

Further, an employer's assertion that an employee was fired for violating a

"'work rule'. . . is arguably pretextual when [the employee] submits evidence (1) that

[he or] she did not violate the cited work rule, or (2) that if [he or] she did violate the

rule, other employees outside the protected class, who engaged in similar acts, were

not similarly treated."  *Jordan v. Warehouse Services*, 81 F. Supp. 2d 1257, 1271

(M.D. Ala. 2000) (alterations in original) (quoting *Damon v. Fleming Supermarkets*

*of Florida, Inc.*, 196 F.3d 1354, 1363 (11th Cir. 1999)).

Under the second prong of the *Jordan* test, a plaintiff can avoid summary

judgment by proving that if "she did violate the rule, other employees outside the

protected class, who engaged in similar acts, were not similarly treated."  *Jordan*, 81

36

F. Supp. 2d at 1271.

> When a claim alleges discriminatory discipline, to determine whether employees are similarly situated, we evaluate "whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) (citations and quotation marks omitted).  When making that determination, "we require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Id.* (citation omitted); see also *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1185 (11th Cir. 1984) (requiring a plaintiff bringing a discriminatory discipline claim to show "that the misconduct for which he was discharged was nearly identical to that engaged in by an employee outside the protected class whom the employer retained") (citations, quotation marks, and alterations omitted).

*Burke-Fowler v. Orange County*, 447 F.3d 1319, 1323 (11th Cir. 2006).

The decision not to renew plaintiff's employment contract was made by three, successive decision-makers:  first by Principal H.L. Noah, who recommended the non-renewal to Superintendent Jeff Wooten; second by Dr. Wooten, who recommended to the Board that plaintiff's employment contract not be renewed; and finally by the Board, four members of which voted to approve the recommendation.  Plaintiff brings claims against only the last two decision-makers: *i.e.*, Dr. Wooten and the Board. Nevertheless, his discussion will address all three decision-makers in turn.

### 1.     Principal H.L. Noah's Decision to Recommend Non-Renewal to Superintendent Jeff Wooten

#### a.     Tardiness

37

Principal H.L. Noah received several reports from Assistant Principal Jason Simmons and Science Department Chair Kathy Eldridge that plaintiff was late for school.[149]  Plaintiff admitted that she was sometimes tardy at the beginning of the 2009-10 school year.[150]

### b.    Failure to attend mandatory faculty meetings

Plaintiff acknowledged that she missed some faculty meeting during the 2009-10 and 2010-11 school years, but testified that football, basketball, and tennis coaches had missed meetings, but were not reprimanded.[151]  Plaintiff has not produced the names of any of the coaches, let alone provided the circumstances under which they allegedly missed the meetings (including, *e.g.*, whether their absences had been excused).  She also has not alleged that the coaches were implicated in the eight *other* forms of misconduct of which she was accused.   Accordingly, this court holds that the coaches are not appropriate comparators.

### c.    Failure to provide substitute teachers with proper lesson plans and additional required information

Science Department Chair Kathy Eldridge and science teacher Leella Holt received several reports from various substitute teachers that plaintiff had failed to

---

[149] Doc. no. 13-10 (Affidavit of Kathryn Eldridge) ¶ 6; doc. no. 13-13 (Affidavit of Jason Simmons) ¶ 10; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 18.

[150] Doc. no. 13-1 (Deposition of Plaintiff), at 50-52.

[151] Doc. no. 13-1 (Deposition of Plaintiff), at 55-60, 121-23.

provide them with proper lesson plans.[152]  Eldridge and Holt found either that plaintiff had left no lesson plans, or that she had left plans that did not keep her students occupied for the duration of the class period.[153]  Eldridge was also not able to locate seating charts, descriptions of school emergency procedures, and notes about students' medical needs.[154]  Eldridge repeatedly complained to Principal H.L. Noah regarding plaintiff's omissions.[155]

Plaintiff denied that she failed to provide substitute teachers with proper lesson plans and additional required information.[156]  Even so, she admitted that, on one occasion, a substitute teacher could not locate her lesson plans, that another teacher reported the incident to Principal H.L. Noah, and that Noah brought the incident to plaintiff's attention.[157]  Based on the uncontroverted evidence that Science Department Chair Kathy Eldridge repeatedly complained to Principal H.L. Noah, this court holds that Noah honestly believed that plaintiff had failed to provide substitute teachers with proper lesson plans and additional required information.

---

[152] Doc. no. 13-10 (Affidavit of Kathryn Eldridge) ¶ 8; doc. no. 13-16 (Affidavit of Leella Holt) ¶ 6.

[153] Doc. no. 13-10 (Affidavit of Kathryn Eldridge) ¶ 8; doc. no. 13-16 (Affidavit of Leella Holt) ¶ 6.

[154] Doc. no. 13-10 (Affidavit of Kathryn Eldridge) ¶ 8.

[155] *Id.*; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 16; doc. no. 13-16 (Affidavit of Leella Holt) ¶ 6.

[156] Doc. no. 13-1 (Deposition of Plaintiff), at 60-64.

[157] *Id.*

### d.    Failure to follow standard laboratory safety measures

Science Department Chair Kathy Eldridge and science teacher Leella Holt allegedly witnessed a number of safety violations by plaintiff's students.[158]  On one occasion, Holt noticed that plaintiff's students were handling acids without wearing goggles.[159]  Holt reported the incident to an unidentified school administrator.[160]  On multiple other occasions, Eldridge observed that plaintiff's students were handling acids without wearing goggles or aprons.[161]  Eldridge also saw one of plaintiff's students dump the contents of an open, glass container onto the grass.[162]  Eldridge reported the incidents to Principal H.L. Noah.[163]

Plaintiff denied that she allowed her students to handle chemicals without wearing goggles and aprons, but admitted that she allowed them to dump a container of water and food coloring onto the grass.[164]  Based on the undisputed evidence that Science Department Chair Kathy Eldridge repeatedly complained to Principal H.L. Noah, this court holds that Noah honestly believed that plaintiff had failed to follow

---

[158] Doc. no. 13-10 (Affidavit of Kathryn Eldridge) ¶¶ 10-12; Doc. no. 13-16 (Affidavit of Leella Holt) ¶ 8.

[159] Doc. no. 13-16 (Affidavit of Leella Holt) ¶ 8.

[160] Id.

[161] Doc. no. 13-10 (Affidavit of Kathryn Eldridge) ¶¶ 10-12.

[162] Id.

[163] Id.

[164] Doc. no. 13-1 (Deposition of Plaintiff), at 68-69.

standard laboratory safety measures.

### e.    Failure to attend graduation examination training sessions

Building Test Coordinator Judy Noah, the wife of Principal H.L. Noah, noticed that plaintiff repeatedly failed to attend scheduled training sessions on administering the high school graduation examination.[165]  Ms. Noah reported plaintiff's failure to attend the training to Principal H.L. Noah.[166]  Plaintiff admitted that she missed the training.[167]

### f.    Failure to attend scheduled parent-teacher conferences

The parents of several of plaintiff's students complained to Principal H.L. Noah, his wife, Judy Noah, and Assistant Principals Denise Woods and Jason Simmons that plaintiff had failed to attend scheduled parent-teacher conferences.[168] In turn, Simmons reported the complaints he received to Principal H.L. Noah.[169] Plaintiff denied missing any appointments with parents.[170]   Based on the uncontroverted evidence of Simmons's reports to Noah, this court holds that Noah

---

[165] Doc. no. 13-14 (Affidavit of Judy Noah) ¶ 9.

[166] *Id.*

[167] Doc. no. 13-1 (Deposition of Plaintiff), at 74-75.

[168] Doc. no. 13-11 (Affidavit of Denise Woods) ¶ 11; doc. no. 13-13 (Affidavit of Jason Simmons) ¶ 13; doc. no. 13-14 (Affidavit of Judy Noah) ¶ 8; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 15.

[169] Doc. no. 13-13 (Affidavit of Jason Simmons) ¶ 13; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 15.

[170] Doc. no. 13-1 (Deposition of Plaintiff), at 72.

honestly believed that plaintiff had failed to attend scheduled parent-teacher conferences.

### g.    Failure to communicate with parents

The parents of several of plaintiff's students complained to Principal H.L. Noah that plaintiff did not communicate with them when their children's grades fell.[171] Parents also complained to Principal H.L. Noah's wife, Judy Noah, Assistant Principal Jason Simmons, Guidance Counselor Sonya Allman, and Science Department Chair Kathy Eldridge that plaintiff did not return their telephone calls or respond to e-mails.[172]   In turn, Simmons, Allman, and Eldridge reported the complaints to Principal H.L. Noah.[173]

Plaintiff denied awareness of parent complaints regarding her failure to communicate.[174]  Inconsistently with that denial, plaintiff recalled that Principal H.L. Noah spoke to her about failing to return a parent's e-mail message.[175]  Based on the undisputed evidence that Noah received a number of complaints from parents, and

---

[171] Doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 15.

[172] Doc. no. 13-10 (Affidavit of Kathryn Eldridge) ¶ 15; doc. no. 13-12 (Affidavit of Sonya Allman) ¶ 7; doc. no. 13-13 (Affidavit of Jason Simmons) ¶ 13; doc. no. 13-14 (Affidavit of Judy Noah) ¶ 8.

[173] Doc. no. 13-10 (Affidavit of Kathryn Eldridge) ¶ 15; doc. no. 13-12 (Affidavit of Sonya Allman) ¶ 7; doc. no. 13-13 (Affidavit of Jason Simmons) ¶ 13; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 15.

[174] Doc. no. 13-1 (Deposition of Plaintiff), at 72-73.

[175] *Id.*

reports of complaints from Simmons, Allman, Eldridge, this court holds that Noah honestly believed that plaintiff had failed to communicate with parents.

### h.    Failure to submit grades in a timely manner

Guidance Counselor Sonya Allman informed Principal H.L. Noah that plaintiff repeatedly failed to provide student grades by the deadline.[176]  Plaintiff did not recall providing student grades late.[177]  Based on the uncontroverted evidence of Allman's complaint to Noah, this court holds that Noah honestly believed that plaintiff had failed to submit grades in a timely manner.

### i.    Leaving school early

Science Department Chair Kathy Eldridge informed Principal H.L. Noah that she often saw plaintiff leave early on those days when her planning period occurred at the end of the day.[178]  Plaintiff denied leaving early without permission.[179]  Based on the undisputed evidence of Eldridge's complaint to Noah, this court holds that Noah honestly believed that plaintiff had left school early.

### 2.    Superintendent Jeff Wooten's Decision to Recommend Non-Renewal to the Board

---

[176] Doc. no. 13-12 (Affidavit of Sonya Allman) ¶ 8; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 17.

[177] Doc. no. 13-1 (Deposition of Plaintiff), at 77-80.

[178] Doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 19.

[179] Doc. no. 13-1 (Deposition of Plaintiff), at 90.

Principal H.L. Noah frequently expressed concerns about plaintiff's job performance to Superintendent Jeff Wooten over the course of the 2009-10 and 2010-11 school years.[180]  Noah gave Dr. Wooten a written memorandum recommending the non-renewal of her employment contract on May 16, 2011.[181]  While the memorandum includes only plaintiff's name, and does not identify the reasons for the recommendation, Noah testified that he made the recommendation "due to the problems with [her] job performance discussed above."[182] Dr. Wooten and Noah deny that Dr. Wooten "told," "directed," or "suggested" to Noah that he should recommend the non-renewal of plaintiff's employment contract.[183]

Superintendent Jeff Wooten did not have the opportunity to observe the daily job performance of teachers in the Muscle Shoals School System.[184]  Thus, Dr. Wooten alleged that he trusted Noah's judgment and gave deference to Noah's personnel recommendations.[185]  Accordingly, this court holds that Dr. Wooten

---

[180] Doc. no. 13-9 (Affidavit of Jeff Wooten) ¶ 7; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 20.

[181] Doc. no. 13-9 (Affidavit of Jeff Wooten) ¶ 9; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 22; *id.*, Exhibit B (05/16/11 Memo from H.L. Noah to Jeff Wooten).

[182] Doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 22 (alteration supplied).

[183] Doc. no. 13-9 (Affidavit of Jeff Wooten) ¶ 8; doc. no. 13-15 (Affidavit of H.L. Noah) ¶ 20.

[184] *See* Doc. no. 13-1 (Deposition of Plaintiff), at 99-101; doc. no. 13-9 (Affidavit of Jeff Wooten) ¶ 8.

[185] Doc. no. 13-9 (Affidavit of Jeff Wooten) ¶ 8.

honestly believed that plaintiff suffered from the performance problems that Noah reported to him in 2009 through 2011.

### 3.   The Board's Decision Not to Renew Plaintiff's Employment Contract

Based on Principal H.L. Noah's description of plaintiff's performance problems, and his recommendation not to renew her employment contract, Superintendent Jeff Wooten exercised his authority and discretion to recommend the non-renewal of the contract to the Board.[186]  *Dr. Wooten did not provide the Board with the reasons for his recommendation.*[187]

At a meeting held on May 23, 2011, the Board voted to approve the recommendation not to renew plaintiff's employment contract by a vote of 4-1.[188] Board Members Mike Elliott, Pam Doyle, Don Pendergrass, and Farrell Southern voted in favor of the recommendation, and Board Member Willis Thompson voted against the recommendation.[189]

To prove that defendants' nine proffered, legitimate reasons for not renewing her employment contract are pretexts for intentional discrimination, plaintiff

---

[186] Doc. no. 13-9 (Affidavit of Jeff Wooten) ¶ 9.

[187] *See, e.g.*, doc. no. 13-9, Exhibit B (Minutes of 05/23/11 Board Meeting), at 15, 18-19.

[188] *Id.* ¶ 10; *see also id.*, Exhibit B (Minutes of 05/23/11 Board Meeting).

[189] Doc. no. 13-9 (Affidavit of Jeff Wooten) ¶ 10; *see also id.*, Exhibit B (Minutes of 05/23/11 Board Meeting).

emphasizes two allegations:  *i.e.*, that Principal H.L. Noah did not proffer those reasons when she asked about the non-renewal; and that Superintendent Jeff Wooten did not provide the reasons when the Board voted on the non-renewal.[190]

Plaintiff's arguments reflect a number of misapprehensions of fact.  In response to defendants' motion for summary judgment, plaintiff asserts that Principal H.L. Noah "would not tell" her the Board's reasons for not renewing her employment contract.[191]  However, both her EEOC charge and her complaint state that the reason for the non-renewal was "tardiness."[192]

Further, plaintiff argues that, "[w]hen [Board member Willis] Thompson asked for the reason to fire [her], the superintendent did not tell him."[193]  However, the minutes of the Board meeting do not show that Thompson "asked" the Superintendent anything.[194]  Instead, they state that the recommendation not to renew plaintiff's employment contract was adopted without discussion, and it only was after the fact that Thompson mentioned a "lack of information provided" on the issue *as his reason*

---

[190] *See* doc. no. 15 (Response to Motion for Summary Judgment), at 17-19.  As noted above, those arguments confusingly appear in a section entitled "*Second* Prong:  No Reason Given for [Plaintiff's] Termination."  *Id.* at 16 (alteration and emphasis supplied).

[191] *Id.* at 18.

[192] Doc. no. 1 (Complaint) ¶ 17 ; *id.*, Exhibit A (02/28/12 EEOC Charge).

[193] *See* doc. no. 15 (Response to Motion for Summary Judgment), at 18 (alterations supplied).

[194] *See* doc. no. 13-9, Exhibit B (Minutes of 05/23/11 Board Meeting), at 15.

46

*for casting the sole vote against the recommendation.*[195]   Although plaintiff testified that Campus Resource Officer Gerald Smith told her that Thompson "asked for proof and none was given to him,"[196] that testimony is multiple hearsay which plaintiff's counsel did not address at Thompson's deposition.

In addition to her misconstruction of the facts, plaintiff also makes several misstatements of law.  First, plaintiff argues that "Texas Dept. Of Community affairs v. Burdine, 450 U.S. 248 (1981), states that the employee, Baugh, has a right to know what she is being fired for.  The board had a right to know what Baugh was being fired for.  Neither of them were given that right.  (Burdine, supra)."[197]  It is telling that plaintiff provides no pinpoint citations to the *Burdine* opinion.  Upon review, no portion of *Burdine* gives an employee the "right" to receive an explanation for an adverse employment action from her employer.  Likewise, *Burdine* does not give a decision-maker the "right" to receive an explanation for a recommended personnel decision from a subordinate.

Plaintiff also contends that:

> Mock v. Bell Helicopter, 196 F. Appx. 77 (11th Cir. 2006): provides that where the employer fails, when asked, to provide a reason for the challenged employment action then the fact finder can presume

---

[195] *Id.* at 15.

[196] Doc. no. 13-1(Deposition of Plaintiff), at 108-09 (alterations supplied).

[197] Doc. no. 15 (Response to Motion for Summary Judgment), at 17.

the employer was motivated by an unlawful discriminatory reason.  This is what happened at the Board meeting to terminate Baugh.  When Mr. Thompson asked for the reason to fire Ms. Baugh, the superintendant did not tell him.  The inference to this fact, is that Mr. Wooten did not know the reason for terminating Ms. Baugh, except to mover [sic] his own daughter into that position.  (Plaintiff's facts, # 15, 16, 17, 18, 19, and Mr. Thompson deposition, defendant's ex 4, Tab B, page 22, lines 4 - 10).   In fact, Mr. Thompson did not learn of the alleged poor performance given for Baugh's non-renewal, until February 12, 2012, almost eight months later, and even then, it was not documented.[198]

The citation to "Mock v. Bell Helicopter, 196 F. Appx. 77" takes the court to *United States v. Fields*, 196 F. App'x 77 (3d Cir. 2006), a criminal appeal from the Third Circuit with no bearing on this action.  Assuming that plaintiff is citing to *Mock v. Bell Helicopter Textron, Inc.*, 196 F. App'x 773 (11th Cir. 2006), the Eleventh Circuit in that case vacated an order granting an employer's motion for summary judgment on a former employee's claims for discriminatory termination because it was

> satisfied that Mock presented sufficient evidence to create a genuine issue of material fact as to whether Bell's reason for his termination was a pretext for age discrimination.  There is a dispute as to when Bell informed Mock of the reason for his termination.  At the time Bell informed him that he was being fired, he insisted that it give him the reason for its decision.  Bell refused to do that.  It was not until later, in a letter, that it told him that he had been terminated for unacceptable performance.  In light of Bell's refusal to tell Mock — at the time it fired him — why his employment had come to an end, a trier of fact reasonably could find that the letter constituted a pretext for

---

[198] *Id.* at 17-19.

discrimination.

*Mock*, 196 F. App'x at 774.

In sum, *Mock* concerns a *former employee's request* to *his employer* to provide the reasons for an adverse employment action *that had already been taken*. It does not concern *a member of a decision-making body's request* to *his subordinate* to provide the reasons for an adverse employment action *that the decision-maker was considering, but had not yet taken*. Thus, *Mock may apply* to plaintiff's claim that Principal H.L. Noah did not proffer reasons when she asked about her non-renewal, but it certainly *does not apply* to her contention that Superintendent Jeff Wooten did not provide reasons when the Board voted on the non-renewal.

With regard to the alleged failure to provide information by Principal H.L. Noah, a district court from the Eleventh Circuit distinguished *Mock* where an employee admitted that the employer "referred to [*one* of the proffered reasons for the adverse action] when he terminated her from her employment." *McCollum v. Amtren, Inc.*, No. 2:05-cv-1237-WKW, 2007 WL 896270, *36 (M.D. Ala. Mar. 22, 2007) (alteration supplied). As in *Mock*, the plaintiff in this case admits in both her EEOC charge and her complaint that defendants provided one of the reasons for the non-renewal of her employment contract in response to her inquiries: *i.e.*, "tardiness."[199]

---

[199] Doc. no. 1 (Complaint) ¶ 17 ; *id.*, Exhibit A (02/28/12 EEOC Charge).

49

With respect to the alleged failure to provide information by Superintendent Jeff Wooten, two Board members (*i.e.*, Mike Elliott and Pam Doyle) testified that they did not know that plaintiff was African-American.[200]   A third Board member (*i.e.*, Willis Thompson) stated that he was aware of plaintiff's race, and nevertheless voted to renew her employment contract.[201]   Thus, even assuming that the two remaining Board members knew plaintiff's race, and voted against her renewal for a discriminatory reason, their votes would not have constituted the three-person majority required for non-renewal.[202]

In an attempt to establish that the Board members were aware of her race, plaintiff contends that they "heard her name, which is traditionally an African-American name and not a white name."[203]   She also claims that "they just voted her in two years again and her race is on her application."[204]   However, the record is devoid of evidence that "Juanica Baugh" is "an African-American name," or that the Board members knew that it was such a name.   There is also no evidence that the Board members read plaintiff's application, that they "voted her in" when she was

---

[200] Doc. no. 13-6 (Deposition of Mike Elliott), at 6-8; doc. no. 13-7 (Deposition of Pam Doyle), at 6.

[201] Doc. no. 13-4 (Deposition of Willis Thompson), at 8, 15, 20.

[202] *See* Alabama Code §§ 16-12-16, 16-24-12.

[203] Doc. no. 15 (Response to Motion for Summary Judgment), at 24.

[204] *Id.* at 25.

hired, or that they remembered her from two years before the non-renewal.

It is important to emphasize that this court does not rule on whether it is wise, fair, or responsible for a school board to approve a superintendent's personnel recommendations without hearing his reasons.  This court only reviews whether plaintiff's employment contract was not renewed on the basis of a discriminatory animus.  *See Alexander v. Fulton County, Georgia*, 207 F.3d 1303, 1341 (11th Cir. 2000) ("It is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated.").  For the reasons explained above, plaintiff has not shown that defendants' proffered reasons for the non-renewal are pretextual.

## F.     Additional Grounds for Summary Judgment on Claims Against Superintendent Jeff Wooten

Although this court could grant the motion for summary judgment in favor of both defendants solely upon the grounds discussed above, it would be remiss not to discuss the additional grounds for granting the motion with respect to the claims against Superintendent Jeff Wooten.

### 1.     Qualified Immunity with Respect to Plaintiff's § 1981 and Title VII Claims

Superintendent Jeff Wooten has interposed as a defense the doctrine of

qualified immunity,[205] which provides "complete protection for governmental officials sued in their individual capacities as long as 'their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Thomas v. Roberts*, 261 F.3d 1160, 1170 (11th Cir. 2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

> The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, *see Anderson v. Creighton*, 483 U.S. 635, 638, 107 S. Ct. 3034, 3038, 97 L. Ed. 2d 523 (1987), protecting from suit "all but the plainly incompetent or one who is knowingly violating the federal law." *Willingham v. Loughnan*, 261 F.3d 1178, 1187 (11th Cir. 2001) . . . . In order to receive qualified immunity, the public official "must first prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991) (quoting *Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir. 1988)).

*Lee v. Ferraro*, 284 F.3d 1188, 1193-94 (11th Cir. 2002); *see also*, *e.g.*, *Chesser v. Sparks*, 248 F.3d 1117, 1121-22 (11th Cir. 2001); *Lassiter v. Alabama A & M University Board of Trustees*, 28 F.3d 1146, 1149 (11th Cir. 1994) (*en banc*).

When an official establishes that he was acting within his discretionary authority in performing a contested act, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate."  *Lee*, 284 F.3d at 1194; *see also*, *e.g.*, *Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997) ("Once an officer or official has

---

[205] Doc. no. 14 (Brief in Support of Motion for Summary Judgment), at 26-30.

raised the defense of qualified immunity, the burden of persuasion as to that issue is on the plaintiff.") (citing *Suissa v. Fulton County*, 74 F.3d 266, 269 (11th Cir. 1996); *Barnette v. Folmar*, 64 F.3d 598, 600 (11th Cir. 1995); *Lassiter*, 28 F.3d at 1150 n. 3).

Superintendent Jeff Wooten's duties as Superintendent are governed by the Board's Policy Manual and Alabama state law.[206]   The Policy Manual states that a Superintendent "recommends for dismissal all employees of the Board except professional officers of the Board."[207]   Likewise, state law allows the Superintendent to recommend the termination of non-tenured teachers, and gives him discretion to choose which teachers to recommend for termination.[208]   Thus, Dr. Wooten has borne his burden of showing that he acted within his discretionary authority by recommending the non-renewal of plaintiff's employment contract.

The section of plaintiff's response to defendant's motion for summary judgment entitled "Case Against Jeff Wooten" states as follows:

> Plaintiff asserts the above facts and argument.   Morton v. Kirkwood, 707 F.3d 1276 (11 Cir. 2013):   Qualified immunity denied based on Morton's version of the facts, that the officer shot an unarmed man in a stationary vehicle while having no reason to believe that the man would be anyone in danger.   Feliciano v. City of Miami Beach, 707

---

[206] Doc. no. 13-9 (Affidavit of Jeff Wooten) ¶ 3.

[207] *Id*; *id.*, Exhibit A (Board Policy Manual), at 485.

[208] *Id.* ¶ 4; *see also* Alabama Code § 16-12-16; Alabama Code ¶ 16-24-1 *et seq*.

F.3d 1244 (11th Cir. 2013):   uncorroborated testimony can defeat summary judgment.  Berry v. Chicago Transit Authority, No. 07-2288 (7th Cir. August 23, 2010).  See also, Grider v. City of Auburn, No. 09-13261 Docket No. 07-01031 (11th Cir. September 7, 2010).[209]

This court is not equal to the task of deciphering that collection of sentence fragments and string citations to unrelated authority.  Plaintiff has not borne her burden of showing the inappropriateness of qualified immunity for the Superintendent's recommendation not to renew her employment contract.  Accordingly, this court holds that Dr. Wooten is entitled to qualified immunity.

## 2.    Propriety of Plaintiff's Title VII Claims

Title VII provides that:

> It shall be an unlawful employment practice for *an employer* —
>
> (1)  to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2)  to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a) (emphasis supplied).  Title VII defines an "employer" as "a

---

[209] Doc. no. 15 (Response to Motion for Summary Judgment), at 26.

54

person engaged in an industry affecting commerce who has fifteen or more employees. . . ." 42 U.S.C. § 2000e(b).  As a result, the Eleventh Circuit has held that "a Title VII claim may be brought against only the *employer* and not against an individual employee."  *Dearth v. Collins*, 441 F.3d 931, 933 (11th Cir. 2006) (emphasis in original).

Defendants argue that plaintiff "cannot sustain a Title VII claim against [Superintendent Jeff] Wooten since he was not her employer."[210]  As is evident from the section of plaintiff's response brief quoted above,[211] plaintiff makes no effort to address the argument that she was employed by the Board, not by the Superintendent. Accordingly, Dr. Wooten is entitled to summary judgment on plaintiff's Title VII claim.

## IV.  CONCLUSION AND ORDER

For the reasons explained above, defendants' motion for summary judgment is GRANTED, and all of plaintiff's claims are DISMISSED with prejudice.  Costs are taxed to plaintiff.  The Clerk is directed to close this file.

DONE and ORDERED this 9th day of July, 2013.

---

[210] Doc. no. 14 (Brief in Support of Motion for Summary Judgment), at 30 (alteration supplied).

[211] Doc. no. 15 (Response to Motion for Summary Judgment), at 26.

_____
United States District Judge